

# SUPREME COURT OF MISSOURI
## en banc

RONALD JOHNSON,                )           *Opinion issued July 16, 2019*
                               )
            Appellant,         )
                               )
v.                             )           No.  SC97330
                               )
STATE OF MISSOURI,             )
                               )
            Respondent.        )

## APPEAL FROM THE CIRCUIT COURT OF THE CITY OF ST. LOUIS
### The Honorable Steven Ohmer, Judge

Ronald Johnson pleaded guilty to one count of first-degree murder, one count of first-degree robbery, and two counts of armed criminal action.  The circuit court sentenced him to life imprisonment without the possibility of parole.   Johnson moved for postconviction relief pursuant to Rule 24.035,[1] arguing his counsel was ineffective and, therefore, his plea was not entered knowingly and voluntarily.  The motion court overruled his motion after an evidentiary hearing.  Because Johnson has not established his counsel was ineffective or his plea was entered unknowingly and involuntarily, the motion court's judgment is affirmed.

---

[1]  References are to Missouri Court Rules 2018.

**Factual and Procedural Background**

Ronald Johnson and Cleophus King were charged with the murder of a local attorney in the city of St. Louis.[2] The State possessed an audio recording that documented the crime as it occurred. Before trial, the State offered Johnson a plea agreement in which the State would abandon seeking the death penalty in exchange for his guilty plea. Given the heinous nature of the alleged crimes and the significant evidence of Johnson's guilt possessed by the State, his counsel advised him he could receive the death penalty if he took his case to trial.

Johnson ultimately accepted the State's offer. At his plea hearing, the circuit court asked Johnson if he understood the charges against him, if he had time to discuss his case with his attorney, and whether he wished to plead guilty. Johnson affirmed he understood the charges, adequately discussed the case with his attorney, and wished to plead guilty. Johnson also affirmed he fully understood the nature of the proceedings against him and he had no mental disabilities that would impair his ability to aid in his defense. The circuit court informed Johnson of the rights he would waive by pleading guilty. Johnson indicated he understood he forfeited those rights by pleading guilty and desired to do so. The State recited the following factual basis to support the guilty plea:

> Judge, had this matter gone to trial, the state would have proven beyond a reasonable doubt, with readily available witnesses and competent evidence that between March 6, 2008, and March 8, 2008, here in the City of St. Louis, specifically at the home of Cleophus King at 5726 Waterman, [Johnson], acting with Cleophus King, knowingly caused the death of [Victim], a friend and acquaintance of [Johnson], that they caused [Victim's]

---

[2] King pleaded guilty to first-degree murder, robbery, and armed criminal action. The circuit court sentenced King to life in prison without the possibility of parole.

death by strangling, stabbing, and beating him, and that they used a knife, multiple knives, weapons, and an extension cord on [Victim].

In the course of that, that [Johnson], acting with Cleophus King, stole and robbed [Victim] of his wallet, keys to his jeep, and that they subsequently went and took those items and the victim's jeep and used the victim's credit cards contained within his wallet to purchase items. And that after killing [Victim] that night, they took his body, wrapped him up and dumped him over in Illinois.

Johnson indicated these facts, as recited by the State, were correct. He also denied there were any threats made to induce his guilty plea.

The circuit court then asked Johnson about his satisfaction with his plea counsel's performance, to which Johnson indicated he was satisfied with his counsel and his counsel had done what Johnson asked him to do. The circuit court accepted Johnson's guilty plea, finding it to be knowing and voluntary, and imposed a sentence of life without the possibility of parole pursuant to the plea agreement.

Johnson filed a timely motion for postconviction relief. In his amended motion, Johnson sought postconviction relief on three specific grounds.[3] Johnson argued he was coerced into pleading guilty by the threat of receiving the death penalty when he was ineligible for such punishment due to intellectual disability; he was not competent at the time of his plea and will never be competent; and his counsel was ineffective for failing to

---

[3] The dissenting opinion makes multiple arguments that were not raised in any prior proceeding, including that Johnson's counsel was ineffective for failing to inform him of all available defenses and for failing to differentiate between incompetency and intellectual disability. *See infra*, § IV. It is well-established that "this Court will not, on review, convict a lower court of error on an issue which was not put before it to decide." *Lincoln Credit Co. v. Peach*, 636 S.W.2d 31, 36 (Mo. banc 1982).

challenge the State's competency evaluation and request an independent evaluation.[4] The motion court conducted an evidentiary hearing, at which Johnson introduced evidence about his low IQ and threats made by his plea counsel that caused him to believe he would receive the death penalty if he took his case to trial even though his low IQ made him ineligible to receive the death penalty. Johnson argued his low IQ made him incompetent to enter his plea, and he would never be competent to enter a guilty plea due to his intellectual disability. At the hearing, Johnson also faulted his counsel for not challenging the State's competency evaluation and not seeking and obtaining an independent evaluation.

Johnson's plea counsel testified he believed Johnson was intellectually slow, but he did not believe Johnson was intellectually disabled based on his interactions with Johnson. Johnson's counsel also denied encouraging Johnson to accept the State's offer or threating that Johnson would receive the death penalty if convicted by a jury. Johnson's counsel instead testified he advised Johnson only of the potential consequences of taking his case to trial, namely, that he could receive the death penalty if he did not accept the State's plea offer. Johnson's counsel testified Johnson decided to accept the plea offer and plead guilty after lengthy discussions with his family. The motion court found Johnson's plea counsel credible, specifically rejecting Johnson's allegation that counsel threatened he would

---

[4] Although Johnson raised counsel's failure to investigate his perceived intellectual disability as grounds for postconviction relief in his Rule 24.035 motion, Johnson failed to raise this argument on appeal. "Contentions not presented in the points to be argued in an appellate brief are abandoned and will not be considered." *Hastings v. Coppage*, 411 S.W.2d 232, 235 (Mo. 1967); Rule 84.04(e) ("The argument shall be limited to those errors included in the 'Points Relied On.'").

4

receive the death penalty if the case proceeded to trial, and overruled Johnson's motion for postconviction relief. Johnson appealed, and this Court ordered transfer pursuant to Rule 83.04.

## Standard of Review

"This Court's review of a motion court's ruling on a Rule 24.035 motion for postconviction relief is 'limited to a determination of whether the findings and conclusions of the [motion] court are clearly erroneous.'" *Latham v. State*, 554 S.W.3d 397, 401 (Mo. banc 2018) (quoting Rule 24.035(k)) (alterations in original). "A motion court's findings and conclusions are clearly erroneous if, after a review of the entire record, the court is left with the definite and firm impression that a mistake has been made." *Id*. (internal quotations omitted).

## Analysis

Johnson seeks postconviction relief pursuant to Rule 24.035,[5] alleging his plea counsel was ineffective for advising him to accept the plea agreement. "If conviction results from a guilty plea, any claim of ineffective assistance of counsel is immaterial except to the extent that it impinges the voluntariness and knowledge with which the plea

---

[5] Rule 24.035(a) states in pertinent part:

> A person convicted of a felony on a plea of guilty claiming that the conviction or sentence imposed violates the constitution and laws of this state or the constitution of the United States, including claims of ineffective assistance of trial and appellate counsel, that the court imposing the sentence was without jurisdiction to do so, or that the sentence imposed was in excess of the maximum sentence authorized by law may seek relief in the sentencing court pursuant to the provisions of this Rule ….

was made." *Cooper v. State*, 356 S.W.3d 148, 153 (Mo. banc 2011). To prove his counsel was ineffective, Johnson must show "(1) counsel's performance did not conform to the degree of skill, care and diligence of a reasonably competent attorney and (2) he was thereby prejudiced." *Webb v. State*, 334 S.W.3d 126, 128 (Mo. banc 2011). "To show prejudice in a guilty plea case, a defendant must prove that, but for the errors of counsel, he would not have pleaded guilty and would have demanded trial." *Cooper*, 356 S.W.3d at 153.

On appeal, Johnson asserts three grounds for relief. First, Johnson argues he was coerced into accepting the State's plea offer when his plea counsel threatened he could receive the death penalty if he took his case to trial. Second, Johnson argues he was incompetent to plead guilty because of his intellectual disability, and that he will never be competent to plead guilty due to his low IQ. Third, Johnson alleges his counsel was ineffective for failing to challenge the State's competency evaluation.

**I.      Johnson was not coerced into accepting the State's plea agreement**

"[A] guilty plea must be a voluntary expression of the defendant's choice, and a knowing and intelligent act done with sufficient awareness of the relevant circumstances and likely consequences." *Cooper*, 356 S.W.3d at 153. "A plea of guilty is not made voluntarily if the defendant is misled or is induced to plead guilty by fraud or mistake, by misapprehension, fear, persuasion, or the holding out of hopes which prove to be false or ill founded." *Drew v. State*, 436 S.W.2d 727, 729 (Mo. 1969) (internal quotations omitted). The record in this case refutes Johnson's assertion that his counsel threatened him or provided any "false or ill-founded" advice. *Id*.

6

### a. Counsel did not threaten Johnson

In his first point, Johnson argues he was coerced into accepting the State's offer by counsel's alleged threat that he could receive the death penalty if he took his case to trial. Johnson argues this constituted coercion in that his fear of receiving the death penalty induced him to plead guilty.

"[T]he test of whether a plea is voluntarily and intelligently made is not whether a particular ritual is followed or whether each and every detail is explained to a defendant but whether the plea in fact is intelligently and voluntarily made." *McMahon v. State*, 569 S.W.2d 753, 758 (Mo. banc 1978). In claiming his plea was coerced by his plea counsel's alleged threat, Johnson must show he was "induced to plead guilty by fraud or mistake, by misapprehension, fear, persuasion, or the holding out of hopes which prove to be false or ill founded." *Drew*, 436 S.W.2d at 729. The record in this case refutes Johnson's assertion that his counsel made any threats that caused him to plead guilty due to "misapprehension" or "fear." *Id*.

Although Johnson alleged his counsel threatened he would receive the death penalty at trial, the motion court did not find Johnson's allegation credible. Johnson testified he pleaded guilty to avoid the death penalty, but Johnson's counsel specifically denied telling Johnson he would definitely receive the death penalty if he went to trial. In other words, Johnson's counsel merely informed Johnson of the potential consequences of rejecting the State's offer and going to trial. The motion court found the testimony of Johnson's counsel credible. "This Court defers to 'the motion court's superior opportunity to judge the

7

credibility of witnesses.'" *McFadden v. State*, 553 S.W.3d 289, 298 (Mo. banc 2018) (quoting *Barton v. State*, 432 S.W.3d 741, 760 (Mo. banc 2014)).

Although the death penalty is "the most extreme sanction available to the State," *State ex rel. Simmons v. Roper*, 112 S.W.3d 397, 406 (Mo. banc 2003), the fact that the maximum authorized punishment for a certain crime may be a threatening alternative in itself does not render a plea involuntary. *Jackson v. State*, 585 S.W.2d 495, 497 n.2 (Mo. banc 1979). In *Rice v. State*, 585 S.W.2d 488, 493 (Mo. banc 1979), this Court held the circuit court's explanation to the defendant that a jury could sentence him "to the penitentiary for any number of years … a hundred years" did not coerce the defendant to plead guilty to a charge of murder in the second degree because it was an accurate representation of the maximum authorized punishment for that crime. Although the circuit court's description of the maximum punishment the defendant faced may have frightened him, this Court held the circuit court's explanation of the range of punishment, even when couched in somewhat hyperbolic terms, did not constitute coercion when the explanation did not exaggerate the maximum authorized punishment. *See id.*; *see also Burks v. State*, 490 S.W.2d 34, 35 (Mo. 1973) (holding the assistant prosecutor's statement that if the defendant took the case to trial, the prosecutor would "make sure that [Burks] got so much time, that [he] wouldn't get out [for] a real long time" did not constitute coercion).

Here, Johnson testified he pleaded guilty to avoid the death penalty, suggesting he was, at least in part, intimidated by the thought of being sentenced to death. But "fear that the death penalty might be imposed [does not] render a plea vulnerable to such an attack." *Jackson*, 585 S.W.2d at 497 n.2; *see also Rice*, 585 S.W.2d at 493. What is more, the

8

record as a whole supports a finding that Johnson was neither threatened nor coerced into pleading guilty. The record demonstrates Johnson understood all the rights attendant to trial he would waive by entering a guilty plea. He also understood the nature of the proceedings against him, the crimes he was charged with committing, and the potential consequences he faced. The record shows Johnson was able to articulate thoughts, feelings, and positions about various matters throughout the course of his prosecution and also that he could rationally weigh options and make decisions he believed were in his best interest. Finally, Johnson denied during his guilty plea hearing that any threats were made to induce his plea. Based on this record and the testimony of Johnson's plea counsel at the motion hearing, the motion court did not clearly err by finding the evidence refuted Johnson's allegation that he was threatened into entering his plea of guilty to avoid the death penalty.

### b. Counsel did not erroneously advise Johnson that he was eligible for the death penalty

Johnson also argues his plea was unknowing and involuntary because his counsel erroneously advised him that he could receive the death penalty at trial. Johnson claims his counsel was ineffective in giving this advice because Johnson was categorically ineligible for the death penalty by virtue of his intellectual disability. Johnson argues, therefore, he was coerced into pleading guilty by counsel's erroneous advice.

Executing intellectually disabled offenders violates the Eighth Amendment's prohibition of cruel and unusual punishment. *See Atkins v. Virginia*, 536 U.S. 304, 321

9

(2002)[6] In *Atkins*, the United States Supreme Court reasoned, "Because of their disabilities in areas of reasoning, judgment, and control of their impulses … [intellectually disabled offenders] do not act with the level of moral culpability that characterizes the most serious adult criminal conduct." *Id.* at 306. The Supreme Court held the abolition of the death penalty for intellectually disabled offenders by multiple jurisdictions in the United States demonstrated a national consensus "that today our society views [intellectually disabled] offenders as categorically less culpable than the average criminal." *Id.* at 316.

But a finding of intellectual disability is not automatic. *See State v. Johnson*, 244 S.W.3d 144 (Mo. banc 2008). Rather, the factfinder must affirmatively find a defendant is intellectually disabled. *See id.* at 150. The burden of proving intellectual disability is on the defendant. *Id.* at 151. Until a capital defendant is adjudged to be intellectually disabled, he remains eligible for the death penalty unless the State waives the death penalty. *See* §§ 565.005.1, 565.020.2[7] (prescribing the maximum punishment for murder in the first degree as "either death or imprisonment for life without eligibility for probation or parole" and the maximum punishment remains death whenever "the death penalty is not waived" by the State).

---

[6] Missouri prohibited the execution of intellectually disabled offenders even before *Atkins* was decided. Section 565.030, enacted in 2001, provides in pertinent part, "The trier shall assess and declare the punishment [for murder in the first degree] at life imprisonment without eligibility for probation, parole, or release except by act of the governor … [i]f the trier finds by a preponderance of the evidence that the defendant is intellectually disabled[.]" § 565.030.4(1).

[7] Statutory references are to RSMo 2000, as amended.

Importantly, "[a]n attorney has an obligation to inform his client of the possible range of punishment of the offense to which he pleads." *Rice*, 585 S.W.2d at 493. Because the trier of fact never adjudicated Johnson to be intellectually disabled, his counsel was, in fact, required to inform him that he was eligible to receive the death penalty upon conviction of murder in the first degree. *Id*. Although Johnson introduced evidence at the hearing on his postconviction motion that he was intellectually disabled, no court or jury ever considered this evidence for the purpose of adjudicating Johnson to be intellectually disabled or made an affirmative finding that Johnson was, in fact, intellectually disabled. Without an affirmative finding of intellectual disability, and because the State had not yet waived the death penalty, Johnson was eligible to receive the death penalty upon conviction of murder in the first degree. *See* §§ 565.005.1, 565.020.2. Accordingly, not only was Johnson's counsel correct to advise him he could receive the death penalty if he took his case to trial, but Johnson's counsel also had a duty to so inform him because he was not categorically ineligible to receive the death penalty. *See Rice*, 585 S.W.2d at 493.

While Johnson's counsel could have more fully investigated Johnson's intellectual capacity and advised Johnson of this defense, any additional investigation or advice by counsel bears no direct correlation to Johnson's decision to accept the State's offer and plead guilty.[8] Johnson testified that he would not have pleaded guilty had he known he

---

[8] Even if Johnson's counsel should have investigated more thoroughly Johnson's intellectual disabilities, Johnson abandoned his failure to investigate claim in this appeal. *See supra*, note 3.

11

was ineligible for the death penalty due to intellectual disability, but Johnson also testified as follows at the motion hearing:

Q. Did you plead guilty to avoid the death penalty?

A. Yes, ma'am.

As explained above, it would have been up to a judge or jury to find that Johnson was intellectually disabled and, therefore, ineligible for the death penalty. In other words, no amount of additional investigation would have changed the fact that Johnson had not yet been adjudicated as intellectually disabled. Because there had been no finding that Johnson was intellectually disabled, whether Johnson remained eligible for the death penalty was solely within the State's control. *See* § 565.005.1. If Johnson's ultimate reason for pleading guilty was to avoid receiving the death penalty, as he testified it was, then any additional investigation and advice from counsel regarding his eligibility for the death penalty would not have affected his decision to accept the State's offer and plead guilty.

Further, Johnson presents no evidence that the State would have held open or extended the same plea offer if Johnson would have pursued the affirmative defense of intellectual disability and been unsuccessful. Accepting the State's plea offer, therefore, was the only way for Johnson to definitively ensure he would not receive the death penalty as punishment for murder in the first degree. Because the advice of Johnson's counsel "was within the range of competence demanded of attorneys in criminal cases," the motion court did not clearly err by denying postconviction relief. *Hill v. Lockhart*, 474 U.S. 52, 56 (1985).

12

## II. Johnson was competent to plead guilty

Johnson argues he was not competent to plead guilty when he entered his plea and he will never be competent to plead guilty because of his limited intellectual capacity. "The standard for determining a defendant's competence to plead guilty is essentially the same as that for determining if a defendant is competent to proceed to trial." *State v. Hunter*, 840 S.W.2d 850, 863 (Mo. banc 1992). "An accused is competent to stand trial or plead guilty if he can rationally consult with counsel and the court and understands the proceedings against him." *Id*. Some degree of intellectual disability does not automatically render a defendant incapable of knowingly and voluntarily pleading guilty. *Wilson v. State*, 813 S.W.2d 833, 835 (Mo. banc 1991); *see also Pulliam v. State*, 480 S.W.2d 896, 904 (Mo. 1972); *Evans v. State*, 467 S.W.2d 920, 923 (Mo. 1971); *State v. Lowe*, 442 S.W.2d 525, 529–30 (Mo. 1969).

At the hearing on his postconviction motion, Johnson introduced evidence establishing he had an IQ of 63. Johnson also adduced expert testimony that tended to show, while he was capable of conversing with his attorney, he did not possess the intellectual capacity to meaningfully assist his attorney in his defense. On the other hand, Johnson's plea counsel testified Johnson was able to repeat and rephrase information he told Johnson, demonstrating Johnson understood the nature of the proceedings and could assist in his defense. Additionally, Dr. Michael Armour, a psychologist employed by the department of mental health, performed a competency exam on Johnson pursuant to § 552.020 and concluded he was competent to stand trial. The motion court found Dr. Armour was a proficient psychologist, whose exam was reliable, and Johnson's

13

evidence was inadequate to undermine Dr. Armour's conclusion. "This Court defers to the 'motion court's superior opportunity to judge the credibility of witnesses.'" *McFadden*, 553 S.W.3d at 298 (quoting *Barton,* 432 S.W.3d at 760). Because there was evidence tending to show Johnson was able to understand the proceedings against him and assist in his defense, it was not clear error to find Johnson was competent to enter a guilty plea.

### III. Counsel was not ineffective for declining to seek a second competency examination

Johnson also alleges his plea counsel was ineffective for failing to challenge Dr. Armour's competency examination and declining to seek a second competency evaluation after Dr. Armour opined Johnson was competent to enter a guilty plea. Johnson argues Dr. Amour's exam was facially deficient and counsel should have sought a second, independent examination before allowing his case to proceed.

Whether a defendant possesses the mental fitness to proceed in a criminal prosecution is a preliminary question for the judge to address. *See* § 552.020.2; *see also Baird v. State*, 906 S.W.2d 746, 749 (Mo. App. 1995). Section 552.020.2 states in pertinent part:

> Whenever any judge has reasonable cause to believe that the accused lacks mental fitness to proceed, the judge shall, upon his or her own motion or upon motion filed by the state or by or on behalf of the accused, by order of record, appoint one or more private psychiatrists or psychologists … to examine the accused; or shall direct the director to have the accused so examined[.]

These protections ensure only those defendants who understand the proceedings against them and are able to aid in their own defense stand trial. *See* § 552.020.1; *Medina v. California*, 505 U.S. 437, 448 (1992) ("If a defendant is incompetent, due process

14

considerations require suspension of the criminal trial until such time, if any, that the defendant regains the capacity to participate in his defense and understand the proceedings against him."). Although defendants may request a second competency evaluation and receive one at their own expense, defense counsel is not ineffective for failing to request a second evaluation solely because the first exam found the defendant competent to proceed. *See Goodwin v. State*, 191 S.W.3d 20, 30 n.6 (Mo. banc 2006); *see also Bass v. State*, 950 S.W.2d 940, 947 (Mo. App. 1997) (collecting cases that hold "counsel is not ineffective for failing to request a second mental examination just because the first examination found the defendant competent").

Dr. Armour performed a competency evaluation on Johnson pursuant to § 552.020. Dr. Armour concluded Johnson did not suffer any mental disease or defect and that he was not intellectually disabled to an extent that limited his ability to understand the proceedings against him or to assist in his own defense. The motion court found this report persuasive. Johnson's counsel testified his interactions with Johnson gave him no reason to question the expert's conclusion that Johnson was competent to plead guilty. Johnson's counsel also testified he had extensive experience using § 552.020 competency evaluations prepared by the department and he had never had any reason to doubt the quality of the department's reports. Although Johnson presented expert testimony that criticized the methods Dr. Armour used in concluding Johnson was competent to plead guilty, the motion court found this testimony unpersuasive and concluded it was insufficient to undermine Dr. Armour's finding of competence. The motion court found Dr. Armour was a capable and respected professional and that it was reasonable for Johnson's plea counsel to rely on

15

Dr. Armour's conclusion. The motion court found a different evaluation "would merely result in a battle of the experts as opposed to a conclusive finding."

Johnson also attempts to fault his plea counsel for not recognizing Johnson's perceived intellectual disabilities on his own. In making this argument, Johnson necessarily contends his counsel should have rejected Dr. Armour's conclusions despite the motion court finding it was reasonable for Johnson's plea counsel to rely on Dr. Armour's report. "Absent a perceived shortcoming in a mental evaluation report or a manifestation of a mental disease or defect not identified by a prior report, an attorney representing a defendant in a criminal case is not compelled to seek further evaluation." *Gooden v. State*, 846 S.W.2d 214, 218 (Mo. App. 1993) (citing *Sidebottom v. State*, 781 S.W.2d 791, 797 (Mo. banc 1989)). Because the record contains competent evidence to support the motion court's finding that Johnson's counsel was not ineffective for declining to seek a second competency evaluation, the denial of postconviction relief was not clearly erroneous.

## IV.    The dissenting opinion

The dissenting opinion raises concerning issues about the representation Johnson received; however, because Johnson did not raise any of the issues, they are not before the Court. At its core, the dissenting opinion contends Johnson is ineligible to receive the death penalty because he is intellectually disabled and, had his plea counsel so advised him, he would not have pleaded guilty. But this is not Johnson's claim on appeal. The issue in

this case is not whether Johnson was intellectually disabled.[9] Nor is the issue whether his plea counsel was ineffective for failing to investigate Johnson's intellectual disability or whether his counsel should have informed him of or pursued this defense. Johnson did not seek postconviction relief on any of these grounds. Rather, the only issues in this case are those Johnson specifically raised in his Rule 24.035 motion and raised again in his appeal. Those claims are Johnson was coerced into entering his plea of guilty by a threat of receiving the death penalty if he took his case to trial; Johnson was incompetent to enter a plea of guilty; and his counsel was ineffective for failing to challenge his § 552.020 competency evaluation.

The dissenting opinion spends considerable time analyzing Johnson's first point relied on, which states:

> The motion court clearly erred when it denied [Johnson's] motion for post-conviction relief following a hearing because [Johnson] proved by a preponderance of the evidence that **he was denied his right to effective assistance of counsel**, due process of law, and freedom from cruel and unusual punishment, as guaranteed by the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution and Article I, § 10 and §18(a) of the Missouri Constitution, **when his attorney coerced him to enter a plea of guilty** to life without parole for murder in the first degree **by using the threat of the death penalty to induce a plea**. This is error in that

---

[9] For this reason, the dissenting opinion's reliance on *Moore v. Texas*, 137 S. Ct. 1039, 1050 (2017) ("*Moore I*"), and *Moore v. Texas*, 139 S. Ct. 666, 671 (2019) ("*Moore II*"), is misplaced. Those cases are inapposite because they turned on the Texas court's erroneous finding that Moore was not intellectually disabled. *Moore I*, 137 S. Ct. at 1050; *Moore II*, 139 S. Ct. at 1050. By contrast, there has never been a finding at any stage in this case as to whether Johnson is – or is not – intellectually disabled. As a result, the dissenting opinion diverts attention from the issues actually presented by this case. Although Johnson may have been able to establish he was intellectually disabled had he sought such a finding, this Court's review of the motion court's denial of postconviction relief is limited to the grounds on which Johnson sought postconviction relief. *See supra*, notes 3, 4, and 8, and accompanying text.

17

a reasonably competent attorney would have known that [Johnson], who had a diagnosis of mental retardation, and whose IQ was listed as 53 in every record reviewed by plea counsel, **was not eligible to be executed**, and a reasonably competent attorney **would not have informed [Johnson] he was at risk for the death penalty if he did not plead guilty**. But for plea counsel's unreasonable advice and lack of knowledge, [Johnson] would not have been coerced into pleading guilty to a sentence of life without parole in a manner that was neither knowing, voluntary, nor intelligent.

(Emphasis added). Absent from this point is any claim Johnson's counsel was ineffective for failing to inform him of or implement any defense based on intellectual disability. All this point asserts is Johnson's counsel was ineffective for coercing him to enter a plea of guilty by informing Johnson he was at risk of receiving the death penalty when he was ineligible for such a sentence. For the reasons laid out above, however, Johnson remained eligible for the death penalty until he accepted the State's plea offer and entered his guilty plea.

The dissenting opinion claims that, upon reading into the context, if not the substance of, Johnson's point relied on, he alleges he was threatened and coerced into entering the guilty plea because plea counsel "misinformed and misled" him on the availability of the defense of intellectual disability. But this is not the claim set out in Johnson's point relied on. Johnson claims he was "not eligible to be executed, and a reasonably competent attorney would not have informed [Johnson] he was at risk for the death penalty." This claim does not allege plea counsel misinformed or misled Johnson on the availability of the defense of intellectual disability.

Johnson's point relied on does allege that his counsel was wrong to advise him that he was at risk of receiving the death penalty because he was ineligible for the death penalty.

18

But, as explained above, because there was no affirmative finding of intellectual disability by a judge or jury, and the State had not yet waived the death penalty, plea counsel did not misinform Johnson that he was eligible to receive the death penalty or otherwise mislead him into erroneously believing he was eligible for that sentence. To the contrary, Johnson's plea counsel was duty-bound to advise Johnson he *was* eligible for the death penalty and could receive this punishment. Johnson's counsel, therefore, did not threaten, mislead, misinform, or otherwise coerce him into pleading guilty by explaining to Johnson that he was eligible to receive the death penalty.

The dissenting opinion also spends considerable time laying out evidence that may support a finding of intellectual disability and, therefore, render Johnson ineligible for the death penalty. But to reiterate, Johnson does not claim in his point relied on that plea counsel was ineffective for failing to raise the defense of intellectual disability. Furthermore, neither the dissenting opinion, the motion court, nor Johnson can predict how the trier of fact would have decided this issue had Johnson raised it in the underlying action. One cannot predict what evidence, if any, the State would have presented in opposition to Johnson's position if he would have raised the defense of intellectual disability, and, as the dissenting opinion acknowledges, the trier of fact would have been free to believe or disbelieve the evidence of Johnson's disability. The dissenting opinion contends had Johnson's plea counsel raised the defense of intellectual disability, then he would not have alleged plea counsel was ineffective. But consider the opposite scenario. Had Johnson's counsel advised Johnson he should reject the State's plea offer because he is ineligible for the death penalty and instead rely on the defense of intellectual disability, and the defense

19

failed, resulting in Johnson receiving the death penalty, Johnson may similarly have raised a claim of ineffective assistance of counsel due to the erroneous advice that Johnson was ineligible for the death penalty and not at risk of receiving the death penalty if he took his case to trial. This exercise illustrates the importance of avoiding speculation about issues not properly raised or briefed.[10]

The Court's review is limited to the arguments Johnson expressly made in his points relied on. Despite the concerns raised by the dissenting opinion, those bases to reverse the motion court's denial of postconviction relief do not appear in Johnson's points relied on. To be sure, the Court is not commenting on the merits of the concerning issues the dissenting opinion raises regarding Johnson's representation. But the fact remains Johnson has failed to establish the motion court clearly erred by entering judgment against Johnson on any of the claims he specifically raised. The Court declines, as it should, to address issues Johnson, himself, did not raise.

---

[10] The dissenting opinion argues the Court should consider the dissent's characterization of Johnson's claim *ex gratia* because the briefing suggests the State "well understood the argument being made." *Slip op.* at 10. But reviewing claims *ex gratia* creates a risk of the Court exceeding its jurisprudential function and assuming a role as advocate instead of arbiter. For this reason, the Court should exercise extreme caution when deciding whether to conduct discretionary *ex gratia* review, as such review is warranted only where necessary to avoid manifest injustice. *State v. Nave*, 694 S.W.2d 729, 735 (Mo. banc 1985); *State v. Ervin*, 835 S.W.2d 905, 921 (Mo. banc 1992). Contrary to the dissenting opinion's contention, there is no manifest injustice in this case to justify setting aside Johnson's guilty plea because Johnson's plea secured his desired outcome – to avoid receiving the death penalty.

**Conclusion**

Because the motion court did not clearly err overruling Johnson's Rule 24.035 motion, the motion court's judgment is affirmed.

_____
W. Brent Powell, Judge

Wilson, Russell, and Fischer, JJ., concur;
Stith, J. dissents in separate opinion filed;
Draper, C.J. and Breckenridge, J., concur in opinion of Stith, J.



# SUPREME COURT OF MISSOURI
## en banc

RONALD JOHNSON,                    )
                                   )
              Appellant,           )
                                   )
v.                                 )     No.  SC97330
                                   )
STATE OF MISSOURI,                 )
                                   )
              Respondent.          )

### DISSENTING OPINION

The principal opinion misapprehends the nature of Ronald Johnson's central claim on appeal and, as a result, fails to address it, much less resolve it.  Mr. Johnson's complaint is not that his counsel correctly told him he could receive a death sentence if convicted of first-degree murder.  His complaint is that counsel *failed* to include critical additional information when Mr. Johnson was contemplating whether to accept a plea deal or go to trial.  Defense counsel failed to inform Mr. Johnson the uncontested evidence showed his IQ was between 53 and 63, which uncontestably put him in the category of those considered intellectually disabled by clinicians.  Defense counsel failed to tell him all of his records, from the age of 10 up to and including the findings of the state expert who performed the competency exam relied on by the prosecution, determined he was mentally retarded or

intellectually disabled.[1]  While, as the principal opinion notes, the jury was not required to accept this evidence, the record contained absolutely no contrary evidence other than evidence the United States Supreme Court has said cannot be considered.  Mr. Johnson needed to be informed that if the jury agreed with all of the experts that he was intellectually disabled, the death penalty would be off the table.  Only then could he make an informed and voluntary decision to plead guilty or go to trial.

Instead, defense counsel misinformed and misled Mr. Johnson as to the availability of a defense that would preclude imposition of the death penalty.  Moreover, counsel failed to inform him that evidence of his intellectual disability increased the likelihood the jury would accept a diminished capacity defense so that he might be convicted of a crime with a lesser level of intent such as second-degree murder or voluntary manslaughter.  This is especially true in light of the evidence of his other mental illnesses, the fact he did not actually perform the murder, and the fact he was emotionally dependent on and dominated by the actual murderer.

This was not a matter of trial strategy.  In defense counsel's own words, "it just never even occurred to [him] to look" at intellectual disability as a defense, and he was not familiar with the law regarding intellectual disability or the fact it made the death penalty unavailable.  He simply failed to understand the difference between being incompetent and

---

[1] The term mental retardation is now viewed as offensive, and its use is discouraged by major advocacy groups.  The preferred term is now intellectual disability.  This opinion uses intellectual disability whenever possible. However, most of Mr. Johnson's educational and medical records, as well as numerous older cases, use the previous term mental retardation.

being intellectually disabled. Defense counsel instead thought the fact Mr. Johnson was "a little slow" did not give him a legal defense because counsel's interactions with Mr. Johnson convinced him Mr. Johnson understood the nature of the proceedings. But the United States Supreme Court has specifically said that this type of evidence goes to competency, not intellectual disability, and that intellectual disability must be determined under clinical standards such as the DSM. *Atkins v. Virginia, 536 U.S. 304, 318 (2002)*. The United States Supreme Court has twice reversed a death penalty conviction when a court based its determination of lack of intellectual disability on the court's personal observations of the defendant rather than on scientific and medical criteria. *Moore v. Texas, 137 S. Ct. 1039, 1050 (2017) ("Moore I"); Moore v. Texas, 139 S. Ct. 666, 671 (2019) ("Moore II")*.

This is more than a failure to investigate in the sense used by the principal opinion – defense counsel did not just fail to investigate or uncover Mr. Johnson's intellectual disability. He had evidence of it, yet failed to recognize the defense or to inform Mr. Johnson about it. Prior Missouri cases make clear this type of incompetence makes the plea involuntary. Further, this failure to inform was prejudicial because Mr. Johnson testified that, had he known of it, he would have rejected the plea offer of life without parole and proceeded to trial. There is no speculation about this testimony, and the motion court did not find this testimony was not credible.

Instead, the motion court, and now the principal opinion, concludes simply that no one can reasonably refuse a plea when there is not a guarantee death is off the table. But that is not a decision for this Court, the motion court, or any court to make. It is for

3

Mr. Johnson. The facts of this case are as close to a guarantee as one can get that death would be off the table, but, even were they less clear, that is Mr. Johnson's call to make.

Indeed, the best evidence of the credibility of Mr. Johnson's claim he would have rejected the plea deal and gone to trial is before this Court today – Mr. Johnson is seeking to have his life without parole sentence set aside so he can go to trial even though the death penalty still, theoretically, is on the table. Mr. Johnson made this decision once he received the information counsel had failed to provide him about the undisputed evidence of his intellectual disability and the availability of that evidence as a means to avoid the death penalty. He is entitled to his day in court.

## I.   *MR. JOHNSON PRESERVED HIS CLAIM FOR APPEAL*

The principal opinion asserts Mr. Johnson did not preserve for review a claim his counsel failed to inform him of or implement an intellectual disability defense. This is incorrect. First, having raised the issue in the motion court, he was entitled to seek review on appeal. *Rule 24.035(k)* (providing for appellate review of an order sustaining or overruling a motion to determine "whether the findings and conclusions of the trial court are clearly erroneous"). The principal opinion says he failed to assert the issue in his points relied on before this Court, however, contending his first point is limited to Mr. Johnson arguing "he was coerced into accepting the State's offer by counsel's alleged threat that he could receive the death penalty if he took his case to trial."

But a more complete reading of Mr. Johnson's first point relied on, and his argument in support in this Court, is that Mr. Johnson complains the coercion as to the threat of the death penalty arose *because* counsel misinformed and misled him about the availability of

4

a defense of intellectual disability.   As discussed below, I believe his first point relied on is more than adequate to preserve that issue on appeal.  Even were that not the case, the principal opinion's refusal to contend with this issue in any manner on the merits is concerning.  This Court could review it *ex gratia*, as it did in *Wilkerson v. Prelutsky, 943 S.W.2d 643, 647 (Mo. banc 1997)*.  Additionally, this Court could find that, having raised and fully briefed the issue in his amended Rule 24.035 motion and discussed it in detail in the argument portion of his first point relied on, Mr. Johnson is entitled to plain error review under *Rule 84.13*.  The principal opinion's failure to offer such review itself constitutes a manifest injustice.

In the motion court, Mr. Johnson made the following argument in his motion under Rule 24.035, an argument ignored here by the principal opinion:

> RONALD WAS COERCED TO PLEAD GUILTY BASED ON A THREAT OF RECEIVING THE DEATH PENALTY WHEN HE WAS INELIGIBLE FOR THAT PUNISHMENT BECAUSE HE SUFFERS FROM MENTAL RETARDATION.
> Ronald was denied effective assistance of counsel, due process, and was subjected to cruel and unusual punishment in violation of his rights under the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution and Article I, Sections 10, 18(a) and 21 of the Missouri Constitution in that his trial counsel, Cleveland Tyson, coerced him into pleading guilty by the threat of the state seeking the death penalty if he were to take the case to trial.  Ronald's guilty pleas **were not voluntarily, knowingly and intelligently made because they were the result of plea counsel's use of coercion to pressure** Ronald into entering his pleas of guilty because the state could not sentence a man suffering from mental retardation to death. **Counsel failed to exercise the customary skill and diligence that a reasonably competent attorney would have exercised under similar circumstances by failing to advance the defense of mental retardation.**  But for counsel's ineffectiveness, Ronald would not have entered a plea of guilty, but would have insisted on going to trial.

(Emphasis added).

5

Mr. Johnson's argument in support of this issue in his amended Rule 24.035 states:

> Ronald's guilty pleas were not **voluntarily, knowingly, and intelligently made because they were the result of plea counsel's use of coercion to pressure Ronald into entering his plea of guilty because the state could not sentence a man suffering from mental retardation to death**. Counsel failed to exercise the customary skill and diligence that a reasonably competent attorney would have exercised under similar circumstances **by failing to advance the defense of mental retardation**. But for counsel's ineffectiveness, Ronald would not have entered a plea of guilty, but would have insisted on going to trial. …

(Emphasis added). Mr. Johnson cited *Atkins* and other relevant case law concerning the bar on executing a person suffering from intellectual disability.[2] The motion court, nonetheless, found counsel was not ineffective because it believed the only rational choice was to accept a sentence of life without parole rather than risk the imposition of death and because, as explained further below, the motion court failed to understand the intellectual disability issue and how it was distinct from Mr. Johnson's competency arguments and, therefore, failed to address it.

Mr. Johnson's point relied on and argument in this Court are, likewise, adequate to raise the issues addressed in this dissent. Mr. Johnson's first point relied on states that his basis for objection is his counsel's misinformation to him about the death penalty:

> … is error in that a reasonably competent attorney would have known that Ronald, who had a diagnosis of mental retardation, and whose IQ was listed as 53 in every record reviewed by plea counsel, was not eligible to be executed, and a reasonably competent attorney would not have informed Ronald he was at risk for the death penalty if he did not plead guilty. *But for plea counsel's unreasonable advice and lack of knowledge, Ronald would not have been coerced into pleading guilty to a sentence of life without parole*

---

[2] *Hoskins v. State, 329 S.W.3d 695, 699 (Mo. banc 2010),* which precludes plain error review of matters not raised in a petitioner's Rule 24.045 motion, therefore, is not applicable.

6

*in a manner that was neither knowing, voluntary, nor intelligent.*

(Emphasis added). In other words, Mr. Johnson's first point relied on raises the argument now made that his plea was not knowing, voluntary or intelligent because he was coerced into pleading guilty by the failure to inform him that intellectual disability would preclude imposition of the death penalty.

Moreover, even were the point inadequate to preserve this argument considered in isolation, this argument is the principal focus of the first 10 pages of Mr. Johnson's brief under this point relied on: that his plea was not voluntary and knowing because his counsel failed to tell him or learn himself that an intellectually disabled person cannot be executed and that he was intellectually disabled under the law and the facts. The brief cites many of the same cases discussed in this dissent. The brief also cites large portions of the record, which it is able to do because almost the entire focus of the testimony of both defense counsel and Mr. Johnson before the motion court during the evidentiary hearing was about what defense counsel knew about intellectual disability and what counsel then failed to share with Mr. Johnson before Mr. Johnson entered a plea. [3]

---

[3] Length prevents quoting the argument in total, but it is publicly available on this Court's website. For instance, Mr. Johnson argues in support of his first point, "'If Appellant's pleas were the product of fraud, mistake, misapprehension, fear, coercion, or promises, he should be permitted to withdraw his guilty plea.' *Tillock v. State*, 711 S.W.2d 203, 205 (Mo. App. S.D. 1986), citing, *Latham v. State*, 439 S.W.2d 737, 738 (Mo. banc 1969)." Mr. Johnson goes on to argue:

> Admittedly, under Missouri Law, a finder of facts has the ability to believe or disbelieve evidence. *Jackson v. State*, 433 S.W.3d 390 (Mo 2014). Yet this is a case where regardless of what witness one believes, state or defense, which records one credits, state or defense, the same result is reached: every test and every record shows Ronald with an IQ well under 70, with severe

7

This Court has long held that, "Cases should be heard on the merits if possible. Statutes and rules should be construed liberally in favor of allowing appeals to proceed." *Sherrill v. Wilson, 653 S.W.2d 661, 663 (Mo. banc 1983).* The purpose of this Court's briefing requirements is to avoid courts facing "the dilemma of deciding that case (and possibly establishing precedent for future cases) on the basis of inadequate briefing and advocacy or undertaking additional research and briefing to supply the deficiency." *Huffman v. SBC Servs., 136 S.W.3d 592, 593 (Mo. App. 2004)*, *citing, Thummel v. King, 570 S.W.2d 679, 686 (Mo. banc 1978).* Here, however, the briefing is more than adequate. The principles of law and facts needed to decide whether Mr. Johnson was adequately informed he had an excellent argument he was ineligible for the death penalty were he to assert that he was intellectually disabled, are raised in his original motion, developed in testimony during the evidentiary hearing, and included in the briefing before this Court.

But, even were the principal opinion correct that Mr. Johnson's points relied on before this Court do not preserve an argument that his counsel failed to inform him of a defense, it does not follow that the principal opinion has no choice but to ignore the argument altogether. Appellate courts "have the discretion to review non-compliant briefs ex gratia where the argument is readily understandable." *Scott v. King, 510 S.W.3d 887, 892 (Mo. App. 2017).* Courts "also have discretion in the interest of justice to review an

functional deficits in his adaptive behavior. (Pcr Tr at 30-3, 54, 55, 73, Lf 39, Exhibit 3). The dictates of *Jackson* do not trump the dictates of *Atkins* and *Hall*, but must be read in harmony with them. The US Supreme Court has been clear-- State procedures have great leeway, but must be crafted to avoid the risk of someone with Mental retardation receiving the death penalty. *See, Moore v. Texas*, 581 U.S. ___, 137 S.Ct. 1039 (2017) ….

8

appeal on the merits even when the statement of facts and points relied on are not acceptable." *Gray v. White, 26 S.W.3d 806, 816 (Mo. App. 1999)*. In *Wilkerson, 943 S.W.2d at 647*, this Court considered a brief that inaccurately objected to a motion *in limine* rather than the admission of the evidence at trial. This Court decided it could rule on the matter because the facts were in front of it, writing, "This Court's policy is to decide a case on its merits rather than on technical deficiencies in the brief*." Id.; accord Wieland v. Owner-Operator Servs., Inc., 540 S.W.3d 845, 854 (Mo. banc 2018)* (Russell, J., dissenting) (objecting to a theory of preservation that parses words and "attempts to manufacture a distinction that is without a difference" when a substantive theory has been advanced through the briefing). This Court, in other words, is free to give the issue full merits review *ex gratia*. Should it choose not to do so, *Wilkerson* further recognized that, while "the point will be disregarded," it is in this Court's discretion whether the issue raised will be "reviewed only for plain error, or the appeal dismissed." *943 S.W.2d at 647*.

While I believe Mr. Johnson has preserved this claim through his points relied on, or merits review *ex gratia,* at least plain error review is appropriate, for the State's lengthy response on the merits showed it well understood the argument being made. "Plain errors affecting substantial rights may be considered on appeal, in the discretion of the court, though not raised or preserved, when the court finds that manifest injustice or miscarriage of justice has resulted therefrom." *Rule 84.13(c)*. [4]

---

[4] Plain error is evident, obvious and clear error. *Farmers Exchange Bank v. Metro Contracting Servs., Inc., 107 S.W.3d 381, 395 (Mo. App. 2003)*. "[T]he error must have prejudiced the appellant, except that such prejudice must rise to the higher level of manifest injustice or a miscarriage of justice." *Id.*

9

And, surely, the case of an intellectually disabled man agreeing to die in prison because he did not understand that, if the jury found he had the disability he and everyone around him said he had, he would not be subject to the death penalty is a case in which "the injustice of the error is so egregious as to weaken the very foundation of the process and seriously undermine confidence in the outcome of the case." *Atkinson v. Corson, 289 S.W.3d 260, 276-77 (Mo. App. 2009)* (internal quotations omitted). The principal opinion errs in failing to address this argument on the merits.

Finally, the majority opinion states that the issue of whether Mr. Johnson is intellectually disabled was not tried below in the underlying criminal case and, therefore, is not properly before this Court. **That is the whole point.** The very reason Mr. Johnson argues defense counsel was ineffective is that he failed to inform Mr. Johnson of the likelihood he would be found to be intellectual disabled and let him decide whether to put that before a fact finder. Yet the principal opinion appears to seriously contend that the very failure which made defense counsel ineffective itself precludes Mr. Johnson from raising the issue of ineffective assistance of counsel because, as the principal opinion writes, examination of the extensive evidence Mr. Johnson is intellectually disabled "diverts attention from the issues actually presented by this case" as "there has never been a finding at any stage in this case as to whether Johnson is — or is not — intellectually disabled." This turns Mr. Johnson's point on its head. Of course his intellectual disability was not determined below, for counsel failed to raise it. Had it been raised, he would not have grounds to allege counsel was ineffective for failing to tell him about how intellectual disability could impact his defense.

10

Further, the principal opinion's hypothetical does not make sense in the context of *why* Mr. Johnson's counsel was ineffective. Mr. Johnson complains his counsel should have told him about how the evidence of his intellectual disability mattered given that he was pleading guilty to avoid the death penalty. The principal opinion seems to excuse this by saying, even were Mr. Johnson informed of the defense of intellectual disability, if it was not successful Mr. Johnson might now be complaining about his counsel's failure to advise him to take the plea.

But an ineffective assistance of counsel claim is not based on whether counsel got the preferred outcome for the client. It is supposed to be based on whether defense counsel's performance conformed to the degree of skill, care, and diligence of a reasonably competent attorney. *Strickland, 466 U.S. at 687-88.* And the first duty of counsel is to give his or her client the information the client needs to make an informed decision whether to take the plea or go to trial.

Had Mr. Johnson's counsel informed Mr. Johnson about this highly technical, specialized defense Mr. Johnson had no hope of knowing about on his own, Mr. Johnson would have had the information he needed to make an informed decision, a decision that was his right to make. Were he found guilty of first-degree murder, the fact counsel informed him of what he needed to know would have precluded a claim that the rejection of the plea was involuntary. Accurate information on which to base a plea decision is what it takes to make the plea knowing and voluntary. *State v. Hunter, 840 S.W.2d 850, 861 (Mo. banc 1992).*

The principal opinion at no point explains why it is permissible for counsel not to

11

have informed Mr. Johnson of the information he needed to make a knowing plea. To say

now that Mr. Johnson cannot claim his counsel was ineffective because no fact finder has

determined he was intellectually disabled because his counsel was ineffective in failing to

learn what intellectual disability is and the defense it provides is circular. Such a Catch-22

scenario does not govern post-conviction relief in Missouri. The issues discussed in this

dissent are preserved.

## II. WHAT IS INTELLECTUAL DISABILITY AND HOW DOES IT DIFFER FROM INCOMPETENCE TO STAND TRIAL?

The principal opinion confuses incompetency and intellectual disability.

Incompetency is an entirely different question from intellectual disability with different, if

overlapping, consequences.

An accused is competent to stand trial if he has "sufficient present ability to consult

with his lawyer with a reasonable degree of rational understanding and has a rational as

well as factual understanding of the proceedings against him." *State v. Wise, 879 S.W.2d

494, 507 (Mo. banc 1994)* (internal quotation omitted), *overruled on other grounds by Joy

v. Morrison, 254 S.W.3d 885, 888 n.7 (Mo. banc 2008)*. At the time of Mr. Johnson's plea,

a Missouri statute stipulated a person found to be incompetent could not undergo trial or

be convicted so long as the person remained incompetent.[5]

By contrast, the United States Supreme Court repeatedly has reaffirmed that

---

[5] "No person who as a result of mental disease or defect lacks capacity to understand the proceedings against him or to assist in his own defense shall be tried, convicted or sentenced for the commission of an offense so long as the incapacity endures." *§ 552.020.1, RSMo 2000.*

intellectual disability goes not to incapacity to be tried but to the defendant's mental state and to whether the death penalty can be imposed – a distinction neither the motion court nor defense counsel seemed to grasp. As it explained this distinction in *Atkins*:

> Mentally retarded persons frequently know the difference between right and wrong and are competent to stand trial. Because of their impairments, however, by definition they have diminished capacities to understand and process information, to communicate, to abstract from mistakes and learn from experience, to engage in logical reasoning, to control impulses, and to understand the reactions of others.

*Atkins, 536 U.S. at 318.* That is to say, the presence of some mental retardation or defect does not automatically render a person incompetent. *Baird v. State, 906 S.W.2d 746, 750 (Mo. App. 1995).* But a finding of intellectual disability makes a person *per se* ineligible for the death penalty. *Atkins, 536 U.S. at 321.*

*Atkins* emphasized courts should look to clinical definitions of intellectual disability, specifically citing those definitions from the DSM-IV and the AAMR, in determining whether a defendant is intellectually disabled.[6] *Id. at 308 n.3, 317 n.22*; *Hall v. Florida, 572 U.S. 701, 720 (2014)* ("The clinical definitions of intellectual disability, which take into account that IQ scores represent a range, not a fixed number, were a fundamental premise of *Atkins*."). Since *Atkins,* the Supreme Court has clarified multiple times that, while the definitions of intellectual disability are left up to the states, the determination

---

[6] The major clinical authorities on intellectual disability, who have been repeatedly referenced by the Supreme Court, are the American Association on Mental Retardation (AAMR) which later became the American Association on Intellectual and Developmental Disabilities, and the American Psychiatric Association which issues the Diagnostic and Statistical Manual of Mental Disorders. *See Atkins, 536 U.S. at 308 n.3.* In *Atkins*, the Supreme Court made it clear courts should look at the most recent materials which, at the time, included the Fourth Edition of the DSM (DSM-IV). *Id.*

13

must be "informed by the medical community's diagnostic framework." *Hall, 572 U.S. at 721*. According to the diagnostic framework followed in *Atkins*, and codified in Missouri statute, there are three major components: (1) "significantly subaverage intellectual functioning,' (2) "continual extensive deficits and limitations in adaptive behaviors …," and (3) those "conditions are manifested and documented before eighteen years of age." *§ 565.030.6, RSMo 2016*.

The Supreme Court in 2017, and again in 2019, explained further what processes may be used to determine "deficits in adaptive behaviors" in two cases explicitly rejecting the Texas courts' finding Bobby Moore was not intellectually disabled. *Moore I, 137 S. Ct. at 1050*; *Moore II, 139 S. Ct. at 1050*. Crucially here, particularly when the Supreme Court took the almost unprecedented step of reversing the Texas courts a second time in *Moore II*, these cases also specify which processes may *not* be used – the processes utilized by the motion court and defense counsel here.

"Because the lower end of Moore's [IQ] score range falls at or below 70, the [Texas appellate court] had to move on to consider Moore's adaptive functioning." *Moore I, 137 S. Ct. at 1049*. The Texas courts found Moore "did not suffer significant adaptive deficits" and thus concluded he was eligible for execution. *Id. at 1050*. The Supreme Court disagreed with the method of analysis the Texas courts used.

First, it found the Texas courts "overemphasized Moore's perceived adaptive strengths" such as looking at the evidence he could do things like mow lawns or play games. *Id.* Instead of looking at evidence of skills, the Supreme Court instructed:

[T]he medical community focuses the adaptive-functioning inquiry on

14

adaptive *deficits*. *E.g.*, AAIDD–11, at 47 ("significant limitations in conceptual, social, or practical adaptive skills [are] not outweighed by the potential strengths in some adaptive skills"); DSM–5, at 33, 38 (inquiry should focus on "[d]eficits in adaptive functioning"; deficits in only one of the three adaptive-skills domains suffice to show adaptive deficits).

*Id. at 1050* (emphasis in original).

The Supreme Court was even more direct in *Moore II*, holding it was inappropriate for the Texas courts to look at Moore's supposed *skills* through anecdotal evidence from counsel regarding Moore's ability to talk and communicate, rather than focusing on the evidence of his *deficits* in these areas, such as evidence that, "in school[,] Moore was made to draw pictures when other children were reading, and that by sixth grade Moore struggled to read at a second-grade level." *Moore II, 139 S. Ct. at 670-71*.

The Supreme Court also faulted the Texas courts for extensively discussing Moore's behavior in prison or basic participation in the case, writing, "Clinicians, however, caution against reliance on adaptive strengths developed 'in a controlled setting,' as a prison surely is." *Moore I, 137 S. Ct. at 1050.* The Supreme Court cites widespread clinical agreement that looking at a defendant's behavior once incarcerated has low probative value. *Id.* (citing the DSM-V and AAIDD–11 User's Guide 20 as advising against examining "behavior in jail or prison"). Instead, the inquiry should be on observed adaptive behavior deficits before the age of 18, such as struggling to read, inability to understand concepts, and poor decision making. *Moore II, 129 S. Ct. at 670-71*.

Finally, the Texas courts relied on a series of factors, called the *Briseno* factors, which ask counsel and family members to give anecdotal impressions of whether the person, essentially, has behaved how they would expect an intellectually disabled person

15

to behave.  *Moore I, 137 S. Ct. at 1044*; *Moore II, 139 S. Ct. at 671*.  The Supreme Court rejected this sanctioned use of anecdotal impressions of lay individuals, writing that basing a determination of intellectual disability on, for example, whether the crime "required planning and forethought" was inappropriate.  *Moore II, 139 S. Ct. at 671-72*.  Instead, the Supreme Court held states should require ***clinical*** evaluations of adaptive behaviors: "the medical profession has endeavored to counter lay stereotypes of the intellectually disabled. See AAIDD-11 User's Guide 25-27; Brief for AAIDD et al. as *Amici Curiae* 9-14, and nn. 11-15. Those stereotypes, much more than medical and clinical appraisals, should spark skepticism."  *Moore I, 137 S. Ct. at 1052;  Moore II, 139 S. Ct. at 671* (the AAIDD criticizes reliance on "incorrect stereotypes" about persons with intellectual disability such as whether they are able to have jobs, complete tasks, have spouses or children).

*Atkins,* as clarified by *Hall*, *Moore I*, and *Moore II*, set out clearly how states are limited by clinical guidance in determining intellectual disability.  To determine whether there is evidence of low intellectual functioning, clinicians give multiple IQ scores and account for a standard error of measurement (five points) when an IQ score is close to, but above 70.  *Hall, 572 U.S. at 712, 723*.  Then, to determine whether this low IQ is accompanied by adaptive behavior deficits, ***clinicians***, preferably using standardized instruments, should examine records from childhood and interview those who knew the defendant, looking only at whether the defendant, when in a non-penal environment, exhibited deficits in conceptual, social, or practice skills.  *Moore I, 137 S. Ct. at 1049-1053*.  Finally, some evidence of the deficits should be available before age 18.  *Id*.

16

**III. THE PRINCIPAL OPINION, THE COURTS BELOW, AND DEFENSE COUNSEL ALL FAILED TO USE THE APPROACH REQUIRED BY MOORE I and II AND CONFUSE THE STANDARD FOR INTELLECTUAL DISABILITY WITH THAT FOR INCOMPETENCY, IGNORING UNDISPUTED EVIDENCE OF MR. JOHNSON'S INTELLECTUAL DISABILITY**

At the time of Mr. Johnson's plea, there was a well-established constraint on trial courts to follow clinical guidance in evaluating intellectual disability. Missouri's prior cases all have adhered to using a medical and scientific approach to determining intellectual disability in prior cases, and Missouri's statute specifically incorporates the clinical definitions of intellectual disability laid out in *Atkins*. In fact, years before Mr. Johnson's plea, this Court in *Goodwin v. State, 191 S.W.3d 20, 31 n.8 (Mo. banc 2006)*, cited the DSM-IV in recommending courts measure adaptive deficits through **clinical scales** such as the Vineland Adaptive Behavior Scale and AAMR-Adaptive Behavior Scale. There was also a clear explication of the difference between intellectual disability and incompetency in *Atkins*. Despite this, defense counsel and the motion court, and now unfortunately this Court, failed to articulate this distinction and failed to follow clinical standards in determining whether Mr. Johnson was intellectually disabled.

**A. The Evidence without Contest Shows Mr. Johnson Has Been Diagnosed Consistently with "Mild Mental Retardation" and Has IQ Scores Far Below 70**

The evidence of Mr. Johnson's intellectual disability is truly extraordinary even by the standards of most *Atkins* claims. Before trial, Johnson's counsel reviewed his childhood records. Mr. Johnson's school records showed that, when he was ten years old, he had a clinical assessment of his IQ that found he had a full-scale IQ score of **53**. This

17

places his score 17 points below what Missouri case law at the time instructed was indicative of low intellectual functioning. *State v. Johnson, 244 S.W.3d 144, 153 (Mo. banc 2008)* ("[A] person with an I.Q. of 70 or lower has significantly subaverage intellectual functioning[.]"). This clinical assessment also confirmed Mr. Johnson's deficits with a diagnosis of "mild mental retardation."

Based on his low IQ and difficulty functioning, Johnson was placed in special education classes. He remained in special education until he was unable to keep up and dropped out of high school in tenth grade. His diagnosis of "mild mental retardation" was reaffirmed by his schools multiple times. He also testified during sentencing that he received disability benefits due to "slow learning."

Prior to trial, Mr. Johnson received a competency exam from Dr. Armour, later used as the State's expert. This State expert diagnosed Mr. Johnson as having "mild mental retardation V borderline intellectual function." The post-trial evidence has confirmed Mr. Johnson's cognitive deficits. Dr. Robert Fucetola assessed Mr. Johnson's cognitive and intellectual functioning in 2014 by interviewing Mr. Johnson and his family and reviewing his records in preparation for the evidentiary hearing on Mr. Johnson's post-conviction motion. Dr. Fucetola reaffirmed Mr. Johnson's diagnosis of mild mental retardation, finding he had an IQ of 63 with the receptive vocabulary of an 8-year-old child.

The evidence of Mr. Johnson's disability is extreme even in *Atkins* litigation. Most litigated cases in Missouri and across the country address situations in which an individual has IQ scores bordering on the top limit for a diagnosis of intellectual disability (at or above 70), and some additional evidence of limited adaptive functioning is considered so the jury

18

or judge can determine whether the defendant's effective IQ is within the five-point margin of error so that he or she really has an IQ of 70 or lower. This was the case in *Hall, 572 U.S. at 724,* which remanded based on the finding Hall was not intellectually disabled because he had an IQ score of 71. The Supreme Court explained, "when a defendant's IQ test score falls within the test's acknowledged and inherent margin of error, the defendant must be able to present additional evidence of intellectual disability." *Id.*

Similarly, this Court wrote in 2008, two years before the plea in this case:

> According to the Diagnostic and Statistical Manual of Mental Disorders IV (DSM-IV), a person with an I.Q. of 70 or lower has significantly subaverage intellectual functioning, but it is possible for an individual with an I.Q. between 70 and 75 to be diagnosed as mentally retarded if they exhibit significant deficits in adaptive behavior.

*Johnson, 244 S.W.3d at 153*; *State ex rel. Lyons v. Lombardi, 303 S.W.3d 523, 526 (Mo. banc 2010)* (finding Lyons met the definition of mental retardation with IQ in the range of 61 to 70); *cf. Goodwin, 191 S.W.3d at 30-31 (Mo. banc 2006)* (holding this Court did not need to consider limited adaptive functioning only because defendant had eight IQ tests showing scores in the mid-70s to 80s).

In fact, no case or authority has been found from Missouri or from *any other jurisdiction* since *Atkins* that considers any person with an IQ of less than 65 (and so outside the margin of error) as being anything other than intellectually disabled, because the DSM provides that one who has an IQ of 70 or lower is intellectually disabled. Adaptive behaviors can cause this score to move up or down by 5 points, but no case has been found stating there is scientific support for finding it can move up the score of one with an IQ of 53 to 63 into the more than 70 range. Even the highest end of the margin of error of Mr.

19

Johnson's highest score is below 70. To contend Mr. Johnson could not have been sure the fact-finder would have taken death off the table is to believe his case would be the first in the nation in the 17 years since *Atkins* to allow the execution of a person who scores as intellectually disabled even at the top end of his IQ range.

### B.     Mr. Johnson Has Multiple Non-Adaptive Behaviors

In addition to low intellectual functioning, the definition of intellectual disability requires the fact-finder to determine Mr. Johnson had "deficits and limitations in adaptive behaviors." Unsurprisingly given Mr. Johnson's IQ score, the record is also rife with documented and extensive deficits in adaptive behavior.[7]

Mr. Johnson's school records reveal severe deficits in his conceptual skills of language and literacy.[8] Years into school he remained functioning at the level of a kindergartner. His Individualized Education Plan (IEP), a required plan done yearly for children with disabilities, reaffirmed his diagnosis of mild mental retardation numerous times throughout his adolescence, most recently in 2002. He was in special education courses until he dropped out of school in tenth grade. His examination before the evidentiary hearing found him to have the receptive vocabulary of an 8-year-old child.

Defense counsel also had medical records revealing Mr. Johnson received disability benefits based on his cognitive impairment. Before entering his plea, Mr. Johnson told the court he was "getting disability checks" for "slow learning." When asked how long he was

---

[7] "Adaptive behavior is the collection of conceptual, social, and practical skills that are learned and performed by people in their everyday lives." *AAIDD* (emphasis omitted).
[8] *Definition of Intellectual Disability, AAIDD, https://aaidd.org/intellectual-disability/definition (last visited July 14, 2019)* ("*AAIDD Definition*").

20

receiving such assistance, Mr. Johnson responded, "Since I was – I can't remember, but I've been since I was just a little kid."

Mr. Johnson's struggles in social skills and practical skills are reflected in his behaviors as he eased into adulthood. *See AAIDD Definition* (defining social skills as, "interpersonal skills, social responsibility, self-esteem, gullibility, naïveté (i.e., wariness), social problem solving, and the ability to follow rules/obey laws and to avoid being victimized"). He did not have steady employment after he dropped out of school in tenth grade. He underwent periods of homelessness. He became HIV positive as a teenager. While in his teens, he began a relationship with Cleophus King, the actual murderer, a significantly older man with a violent history. Mr. Johnson testified later he was "scared" of Mr. King, and did not know how to end the relationship before Mr. King directed him to participate in the robbery and murder.

After his examination of Mr. Johnson just before the postconviction hearing, Dr. Fucetola confirmed Mr. Johnson had severe deficits in all areas of understanding and ability in his daily life and had impaired reasoning ability and understanding of the legal process. Dr. Fucetola believed Mr. Johnson would be easy to lead or coerce and struggled in dealing with unexpected situations or making decisions in his own interest.

### C. Counsel, the Courts below and the Principal Opinion Use the Wrong Test for Intellectual Disability under Atkins, Moore I, *and* Moore II

Had counsel below, the motion court, or the majority opinion reviewed the record in light of the scientific standard required by *Atkins*, and now as reaffirmed by *Moore I* and *Moore II,* it would be apparent that Mr. Johnson has presented substantial and

uncontroverted evidence of intellectual disability and that there is, quite literally, no relevant contrary evidence.

After reading his childhood records, which unequivocally diagnose Mr. Johnson with mental retardation, Mr. Johnson's counsel failed to understand that they showed defendant was intellectually disabled. Based on the records and on his interaction with Mr. Johnson, counsel requested the competency evaluation performed by Dr. Armour because of counsel's "concerns about his mental ability to understand what's going on or his mental ability." But counsel failed to request an examination of Mr. Johnson's intellectual ability. He then failed to recognize the significance of the Dr. Armour's report containing a diagnosis of mild mental retardation.

In fact, defense counsel knew so little about intellectual disability, he did not even notice or remember that Dr. Armour's report contained this diagnosis. Once reminded of this by being shown Dr. Armour's report, the following exchange took place:

> **Q. And did Mr. Armour's diagnosis include mental retardation?**
> **A. Did his diagnosis --**
> **Q. Include mental retardation.**
> **A. It says here mild mental retardation V borderline intellectual function.**
> Q. And you had a copy of that exam as well as the Court did; is that correct?
> A. Of course.
> Q. Are you familiar with *Atkins vs. Virginia*?
> A. Vaguely.
> **Q. Do you know the whole *Atkins vs. Virginia*?**
> **A. Not offhand.**
> **Q. Are you familiar with *Hall vs. Florida*?**
> **A. No.**
> Q. Is someone who suffers from mental retardation eligible for the death penalty?
> A. I do not believe so.
> Q. Did you discuss this with Mr. Johnson?

22

A. I did not believe that Mr. Johnson was found to be mentally -- have mental retardation. Close to it, but not mental retardation.
Q. What is the definition of mental retardation?
A. I'm not a doctor. I don't know. I just know that in my -- my relationship with Mr. Johnson and in speaking with him, that I did not believe that he suffered from mental retardation.
**Q. Are you familiar with the standards that have been used by the U.S. Courts?**
**A. I don't know what -- I don't understand the question.**
**Q. What standard of the definition of mental retardation was used?**
**A. I don't know.** If you provide me with it, I could tell you.
Q. Did you know at the time?
A. I did not believe he was mentally retarded.
**Q. But you did not know what the definition was?**
**A. It was -- just never even occurred to me to look.**

(Emphasis added). Despite having no familiarity with the definition of intellectual disability, and despite testifying that he has no relevant medical or clinical experience, defense counsel testified he did not believe Mr. Johnson was intellectually disabled. Counsel's first grave error, therefore, was totally failing to familiarize himself with the legal standard of who is eligible to be executed before giving Mr. Johnson advice about how to avoid execution.

But defense counsel's rationale for his actions – a rationale the principal opinion seems to approve – is equally problematic and presents his second grave error. Instead of relying on scientific or legal standards, counsel stated he based his belief in Mr. Johnson's mental abilities on the very factors that *Moore I* and Moore *II* have said are impermissible – his own personal perceptions of Mr. Johnson:

A. I did not believe that Mr. Johnson was found to be mentally -- have mental retardation. Close to it, but not mental retardation.
Q. What is the definition of mental retardation?
A. I'm not a doctor. I don't know. I just know that in my -- my relationship with Mr. Johnson and in speaking with him, that I did not believe that he

suffered from mental retardation.

Defense counsel further testified he remembered Mr. Johnson "was slow" and "had concerns about his mental ability to understand what's going on." But he said, "it never occurred to me to request a hearing or that he was mentally retarded or that there was -- there was any issue as such." He testified that, in his perception, the difference between his perception of Mr. Johnson as developmentally slow and a diagnosis of intellectually disabled was "semantics." Defense counsel testified Mr. Johnson did not seem to have difficulty understanding him, and he never had concerns Mr. Johnson did not understand what he was telling him. Defense counsel noted Mr. Johnson "wrote letters," saying there was "a whole bunch of written correspondence from Mr. Johnson." He also testified any argument Mr. Johnson was intellectually disabled would be unconvincing to a jury because of the facts of the case – that, "because he could have run away … while the co-defendant was struggling with this man Mr. Johnson could have left, but he didn't."[9]

Defense counsel essentially testifies he did not need to pursue a court determination of intellectual disability because he casually talked with Mr. Johnson and then decided Mr. Johnson was slow but seemed to understand him. This recreates exactly the type of reliance on ad hoc, anecdotal impressions that the Supreme Court has said, "create[s] an unacceptable risk that persons with intellectual disability will be executed."

---

[9] The motion court similarly asked Mr. Johnson questions about those same behaviors during the evidentiary hearing such as, "You would write me letters about problems you were having in the jail, right?" "[W]e communicated and it doesn't seem to me that we – that there wasn't any problem between you and I during that time that I'm aware of; is that accurate?"

24

*Moore I, 137 S. Ct. at 1051* (internal quotation omitted). Defense counsel believes the difference between being developmentally slow and being diagnosed as intellectually disabled is "semantics." It is not semantics. The distinction carries extraordinary legal significance.

> **D.** **Plea Counsel Inappropriately Conflated a Finding Mr. Johnson Is Competent with a Determination of Whether Johnson Is Intellectually Disabled**

The record also shows counsel – and more unfortunately the principal opinion and the motion court – continued to confuse the difference between incompetency and intellectual disability, despite the United States Supreme Court's explicit recognition that the two are different, both factually and in legal consequence. And counsel did so based on his personal perceptions of what he believed to be Mr. Johnson's *competency* rather than based on medical evidence of his intellectual disability.

At the hearing on Mr. Johnson's Rule 24.035 motion, defense counsel testified he asked Dr. Armour to conduct a competency exam and report because:

> I had some educational records which indicated that there might be some -- might be some developmental issues. Also, due to the fact that it is such a serious case I thought that would be appropriate and also because if -- when you look at the facts of the case and look at possible defenses, having some type of diminished mental capacity may have been advantageous for trial.

Defense counsel requested only a competency exam, not a full examination of Mr. Johnson's intellectual or cognitive functioning. Despite these being separate concepts and defenses, defense counsel testified that, because the report from Dr. Armour stated Mr. Johnson was competent, he did not take steps to inform his client (or bring up in court or in plea negotiations) that his multitude of records showing low IQ, deficit in adaptive

25

behaviors, and the consistent diagnosis of "mild mental retardation" also had legal ramifications. When asked by the State at the evidentiary hearing, "coupled with Dr. Armour's evaluation and your personal interactions with [Mr. Johnson], you felt that it was not a good trial strategy to try to argue the defendant was mentally retarded and ineligible for the death penalty?" defense counsel agreed that was true.

Mr. Johnson raised these failures in the motion court in support of his claim that counsel was ineffective, arguing that counsel's failure to inform him those with "mild mental retardation" cannot be executed caused him to plead guilty rather than go to trial. Mr. Johnson also argued the evidence showed he was incompetent. The motion court conflated these two claims into one, just as defense counsel had done, and found, because Dr. Armour had found Mr. Johnson competent, it was just speculation another evaluation would reach "a different conclusion" about his *competence*:

> It is certainly reasonable for plea counsel to rely upon the evaluation conducted by a psychologist who is a certified forensic examiner and is employed by the agency designated by Missouri Statute to determine competency to proceed to trial rather than hope that a different evaluator paid by plea counsel would come to a different conclusion.

While the motion court's reasoning in rejecting appointment of another competency expert is sound, it fails to recognize this did not address Mr. Johnson's separate claim that the record showed he was intellectually disabled and counsel was ineffective in failing to so recognize and present that defense or ask for another evaluator of that mental condition. Indeed, the "certified forensic examiner," Dr. Armour, on whose exam the motion court relies on, actually found Mr. Johnson *was intellectually disabled* but was competent – the very distinction recognized in *Atkins* but not by defense counsel or the motion court.

26

Unfortunately, rather than untangling the motion court's mixing of Mr. Johnson's two defenses, the principal opinion doubles down on it. In addressing Mr. Johnson's argument that his counsel should have objected to the competency report, the majority opinion uses the lack of merit of that objection to also reject Mr. Johnson's claim that his counsel should have followed up on the issue of intellectual disability, stating:

> *Johnson also attempts to fault his plea counsel for not recognizing Johnson's perceived intellectual disabilities on his own. In making this argument, Johnson necessarily contends his counsel should have rejected Dr. Armour's conclusions despite the motion court finding it was reasonable for Johnson's plea counsel to rely on Dr. Armour's report.* "Absent a perceived shortcoming in a mental evaluation report or a manifestation of a mental disease or defect not identified by a prior report, an attorney representing a defendant in a criminal case is not compelled to seek further evaluation." *Gooden v. State*, 846 S.W.2d 214, 218 (Mo. App. 1993) (citing *Sidebottom v. State*, 781 S.W.2d 791, 797 (Mo. banc 1989))"

(Emphasis added).

But the majority opinion's reasoning misses Mr. Johnson's point entirely. The issue is not that his counsel should have recognized his intellectual disabilities through his interactions with Mr. Johnson – as previously discussed, *Moore I* and *Moore II* reject use of lay perceptions as a permissible basis for determining intellectual disability. The issue is that Dr. Armour's examination reconfirmed that, while Mr. Johnson was competent, it also put defense counsel on notice that Mr. Johnson was again diagnosed with "mild mental retardation."

Far from stating the motion court should have altogether rejected Dr. Armour's report, Mr. Johnson complains a competency exam is not enough to firmly establish intellectual disability but, ironically, did give defense counsel enough information that he

27

should have known to present an intellectual disability defense, if the existing records somehow were not enough already. The principal opinion continues to confuse the difference between the two by writing an attorney does not need to seek further evaluation of intellectual disability when there is a competency exam on file.

To summarize: when plea counsel was advising Mr. Johnson, the evidence on hand showed multiple diagnosis of "mild mental retardation" beginning at age 10, an IQ score of 53, and a lifetime of maladaptive behaviors. The evaluation of Mr. Johnson done before the motion court, the third independent evaluation that has found Mr. Johnson's IQ was 63 and in the bottom first percentile of intellectual functioning, only underscores these findings. Simply put, the evidence of Mr. Johnson's intellectual disability was overwhelming and obvious. It squarely put Mr. Johnson within the compass of those ineligible for the death under *Atkins*.

Yet defense counsel did not understand that governing Supreme Court precedent mandated the death penalty was off the table – even if Mr. Johnson were found guilty of first-degree murder – so long as intellectual disability could be established. Defense counsel did not understand this because he did not understand how competence is different than intellectual disability. He did not understand this because he believed he could tell who is intellectually disabled, even without medical training. And he did not understand this because he never read any of the governing Supreme Court precedent.

This, as explained *infra*, does not match any precedent regarding what constitutes effective assistance of counsel, and this Court should not deem it acceptable.

28

***IV. MR. JOHNSON SUFFERED FROM INEFFECTIVE ASSISTANCE OF COUNSEL AS DEFENSE COUNSEL FAILED TO INFORM HIM OF BASIC FACTS ABOUT HIS ELIGIBILITY FOR THE DEATH PENALTY AND GAVE HIM NO INFORMATION ABOUT A RELEVANT DEFENSE***

Despite this extraordinary record, the principal opinion is able to affirm the motion court's finding that Mr. Johnson did not suffer ineffective assistance of counsel by finding, "The record in this case refutes Johnson's assertion that his counsel threatened him or provided any 'false or ill-founded' advice. *Drew*, 436 S.W.2d at 729." This ignores the facts and law set out below, as well as the appropriate standard for granting postconviction relief, which requires counsel to inform the defendant of the various courses of action and defenses as well as the possible outcomes of a trial.

If a movant's plea is the product of "fraud, mistake, misapprehension, fear, coercion, or promises," he or she should be permitted to withdraw his or her guilty plea." *Tillock v. State, 711 S.W.2d 203, 205 (Mo. App. S.D. 1986), citing Latham v. State, 439 S.W.2d 737, 738 (Mo. banc 1969).* Further:

> It is beyond dispute that a guilty plea must be both knowing and voluntary. The standard was and remains whether **the plea represents a voluntary and intelligent choice *among the alternative courses of action open to the defendant.*** That is so because a guilty plea constitutes a waiver of three constitutional rights: the right to a jury trial, the right to confront one's accusers, and the privilege against self-incrimination.

*Parke v. Raley, 506 U.S. 20, 28-29 (1992)* (internal quotations and citations omitted) (emphasis added). Courts will find ineffective assistance of counsel when the evidence shows plea counsel failed to inform the defendant of a relevant defense, the defendant pled guilty having no recourse to know such a defense at trial would be available, and the defendant credibly asserts they would not have pled guilty if he or she had the full

29

information.  *Bequette v. State, 161 S.W.3d 905, 908 (Mo. App. 2005).* [10]

There is no question defense counsel failed to inform either himself or Mr. Johnson of the fact that Mr. Johnson  diagnoses of intellectual disability, if accepted by the jury, would preclude the death penalty as a matter of law and would strengthen his claims that diminished capacity also diminished his culpability to the level of second-degree murder or voluntary manslaughter.  These are technical and legal elements of proof and defense that are outside of the common knowledge of a lay defendant.  *Whitehead v. State, 481 S.W.3d 116, 125 (Mo. banc 2016)* (holding lawyers must properly advise of a defense to ensure a plea is voluntary when "the legal concept underlying the potential [defense] … is not as evident to a non-lawyer" (internal quotations omitted)).

This Court's cases have required counsel to explain these defense concepts to the defendant to ensure his plea was "a knowing and intelligent act done with sufficient awareness of the relevant circumstances and likely consequences." *Cooper v. State, 356 S.W.3d 148, 153 (Mo. banc 2011).*  This is because:

> While counsel may ultimately advise a defendant to plead guilty based on the circumstances in a given case, counsel still has the basic duty to discuss the circumstances and possible consequences of entering a plea, including possible defenses to the offense charged, in order to ensure that the defendant makes an informed and intelligent decision about waiving the right to trial.

---

[10] Often, these claims closely overlap with claims counsel has failed to investigate, another area in which courts have been willing to declare ineffective assistance of counsel.  *Hinton v. Alabama, 571 U.S. 263, 274 (2014)* ("An attorney's ignorance of a point of law that is fundamental to his case combined with his failure to perform basic research on that point is a quintessential example of deficient performance under *Strickland*.").  As the principal opinion points out, the facts of Mr. Johnson's case raise serious concerns his plea counsel failed to adequately investigate his claim, although the principal opinion finds it does not have to reach that issue due to rules of preservation.

*Wiggins v. State, 480 S.W.3d 379, 383 (Mo. App. 2015)*. A plea "must not only be a voluntary expression of the defendant's choice, it must be a knowing and intelligent act done with **sufficient awareness of the relevant circumstances** and likely consequences of the act." *State v. Hunter, 840 S.W.2d 850, 861 (Mo. banc 1992)* (emphasis added).

Similarly, *Rice v. State, 585 S.W.2d 488, 493 (Mo. banc 1979)*, on which the majority opinion relies to note correctly that counsel was required to inform Mr. Johnson that the death penalty was not off the table, also stated the defendant was entitled to "identify any particular item of information … that the attorney failed to seek out, and … allege that had such information been available appellant would not have entered a guilty plea."

That is just what Mr. Johnson does here. He raised the failure to meet this standard here, arguing in his amended Rule 24.035 motion to the trial court, "Had his lawyer insisted a proper mental health evaluation be performed, Ronald would have known that the state could not achieve its stated goal of the death penalty. Therefore, Ronald was ***misled, misinformed, and coerced*** into accepting a life without the possibility of parole sentence when this sentence was the maximum he could get at trial." (Emphasis added).

Defense counsel not only failed to inform Mr. Johnson that he could be found to be ineligible for the death penalty, but he also in fact affirmatively misinformed Mr. Johnson that there were only three potential outcomes to resolve his case. Defense counsel testified that his normal practice as an attorney was to "express the charges, what the ranges of punishment are and what are the possible outcomes." Defense counsel testified he told Mr. Johnson there were three options: first, "if he pled guilty he would have been eligible

31

for the death penalty;" second, "he could be found guilty of murder in the first degree and that he could possibly get life in prison;" and "a third possible outcome that if by some wonderful – wonderful opportunity we might possibly be able to get a murder second through some diminished capacity defense or something like that."

Defense counsel contended in his testimony, and the principal opinion accepts, that his communication with Mr. Johnson was not misleading or inadequate because he did not "go to [Mr. Johnson] and say if you were found guilty you would get the death penalty, absolutely not." But defense counsel acknowledges he had a full conversation with Mr. Johnson where he presented all "the possible outcomes" for Mr. Johnson to avoid getting the death penalty. He further acknowledges this did not include him informing Mr. Johnson there was a legal avenue to have a fact finder conclude Mr. Johnson was intellectually disabled.

"A plea of guilty is not made voluntarily if the defendant is misled." *Drew v. State, 436 S.W.2d 727, 729 (Mo. 1969)* (internal quotations omitted). It is misleading for counsel to inform a defendant there are a finite number of possibilities for how his or her case could be resolved through plea or trial when the defense counsel omits a major relevant defense from that list of possibilities. It was unreasonable for plea counsel to contend, and the motion court to affirm, that plea counsel did not need to inform a person with a recorded IQ of 53 and a lifetime of "mild mental retardation" diagnoses that the evidence supports a finding they are intellectually disabled. Defense counsel's performance in failing to inform Mr. Johnson of this defense fell below an objective standard of reasonableness.

32

*V. DEFENSE COUNSEL'S INCOMPETENCE CAUSED PREJUDICE AS MR. JOHNSON CREDIBLY STATES HE WOULD NOT HAVE PLED GUILTY AND WOULD HAVE GONE TO TRIAL HAD HE KNOWN INTELLECTUAL DISABILITY DISQUALIFIES SOMEONE FOR THE DEATH PENALTY*

"To show prejudice in a case where the movant entered a guilty plea, the movant must show a reasonable probability that, but for counsel's unprofessional errors, movant would not have pleaded guilty and would instead have insisted upon going to trial." *State v. Nunley, 980 S.W.2d 290, 292 (Mo. banc 1998), citing Hill, 474 U.S. at 59.*

Both Mr. Johnson and defense counsel acknowledged in their testimony that the plea was specifically entered into to avoid the possibility of death. Defense counsel testified the prosecution offered to not seek the death penalty in exchange for Mr. Johnson testifying against his co-defendant, as prosecutors even at the beginning of the case believed Mr. Johnson was the less culpable party. But Mr. Johnson stated at his evidentiary hearing on his Rule 24.035 motion that, had he known of the existence of the defense to death eligibility, he would not have pled guilty but instead would have gone to trial. He specifically stated, *if he had been properly informed of this defense to the imposition of death, he would not have accepted a plea deal based solely on avoiding the death penalty:*

> **Q. If someone had told you that being mentally retarded meant that you could not get the death penalty, would you have still pled guilty?**
> **A. No, ma'am.**
> **Q. Did you plead guilty to avoid the death penalty?**
> **A. Yes, ma'am.**

(Emphasis added).

Earlier in the case, the State tried to rescind the deal and put death back on the table after it was discovered Mr. Johnson was receiving letters from his co-defendant, Cleophus

King, while in jail. The trial court held a hearing on the State's motion to withdraw Mr. Johnson's plea. Mr. Johnson testified Mr. King had been writing him about Mr. King's plot to kill one of the prosecutors. Mr. Johnson also agreed to Mr. King's suggestion, through a series of letters, to commit suicide and "let [Mr. King] put the entire case on him." After Mr. King was moved to a different facility, Mr. Johnson asked if he could go through with the plea as he was no longer scared of Mr. King. The trial court then overruled the State's motion to withdraw Mr. Johnson's plea despite his misconduct in communicating with Mr. King. The trial court issued an order basing this denial on the fact that, "*The Defendant is a young man with a slow learning disability*" and "cooperation with Cleophus King was a result of intimidation." (Emphasis added). Stunningly, even at this point, neither defense counsel nor the trial court stopped to consider whether someone who had a "slow learning disability" was even death eligible. Instead, the trial court allowed Mr. Johnson to go through with the plea *in order to help him avoid the death penalty*.

The motion court did not find credibility lacking in Mr. Johnson's statement that he would not have pled guilty had he known he could have asked to be found ineligible due to intellectual disability. Rather, because of a lack of familiarity with *Atkins*, *Moore I*, and *Moore II*, and how to determine intellectual disability, the motion court disagreed that Mr. Johnson was not death eligible, so that "The plea agreement offered by the State and accepted by Movant was the only guarantee that the death penalty was 'off the table.'"

The principal opinion believes there was not prejudice, writing:

> It would have been up to a judge or jury to find that Johnson was

34

intellectually disabled and, therefore, ineligible for the death penalty. In other words, no amount of additional investigation would have changed the fact that Johnson had not yet been adjudicated as intellectually disabled. If Johnson's ultimate reason for pleading guilty was to avoid receiving the death penalty, as he testified it was, then **any additional investigation and advice from counsel regarding his eligibility for the death penalty would not have affected his decision to accept the State's offer and plead guilty**.

Further, Johnson presents no evidence that the State would have held open or extended the same plea offer if Johnson would have pursued the affirmative defense of intellectual disability and been unsuccessful. Accepting the State's plea offer, therefore, was the only way for Johnson to definitively ensure he would not receive the death penalty as punishment for murder in the first degree

(Emphasis added).

In other words, the principal opinion concedes counsel may have been deficient in informing Mr. Johnson of his possible defenses but suggests no prejudice results. The principal opinion, like the State, does not offer any specific evidence or reasoning to support its conclusory statement that neither the plea offers from the State nor the trial itself would be impacted by Mr. Johnson pursuing a determination he was intellectually disabled. It just apparently presumes that, if the State is technically able to seek the death penalty, it would be unreasonable for Mr. Johnson to reject it and go to trial, even if there is a viable legal defense or piece of evidence that, if accepted, would change the outcome.

This assumption is inconsistent with the fact it was Mr. Johnson's right to consider the exceedingly small risk the jury would reject the overwhelming evidence of intellectual disability and weigh that risk against the finality of the death penalty in deciding whether to accept a plea agreement that gave him the harshest sentence he could have received under the law if the death penalty were excluded. This assumption is also inconsistent with Missouri's prior cases, which have found prejudice when criminal defendants were not

35

permitted to weigh the viable defenses, even though mounting a defense is a trial strategy decision that is not guaranteed. The cases are clear a defendant need not prove a defense would be successful to have the right to be properly informed of it.

For instance, the court of appeals in *Wiggins, 480 S.W.3d at 383*, remanded for an evidentiary hearing when the movant plausibly alleged facts showing that counsel failed to discuss the viability of arguing for a conviction of voluntary manslaughter rather than second-degree murder, rejecting the motion court's reasoning this defense may not have mattered due to the existence of contrary evidence on defendant's mental state. The court held, "While there is no guarantee that Movant would have successfully convinced a jury that he committed voluntary manslaughter rather than second-degree murder, he was entitled to weigh that option before pleading guilty." *Id*. *at 384* (emphasis added).

In *Bequette, 161 S.W.3d at 908*, a criminal child support case, the appellate court found the defendant's plea should be vacated if the facts at the evidentiary hearing showed plea counsel told him the non-support records were totally determinative of his guilt and failed to inform him of or investigate a defense based on in-kind support, despite the counsel having evidence of this potential defense.

Likewise, in *Rinehart v. Brewer, 561 F.2d 126, 132 (8th Cir. 1977)*, the Eighth Circuit found ineffective assistance of counsel when counsel did not inform a 15-year old defendant (or his parents) of the possibility of a manslaughter conviction or a self-defense argument before the defendant pled guilty to second-degree murder. There, as here, the outcome of the defense was uncertain as the ultimate determination of the defendant's mental state was up to the jury. But, still, the court held that the guilty plea was not

voluntarily entered "because he was unable to make an intelligent and informed choice from among his alternative courses of action." *Id.*

And this Court has found defense counsel's "failure to pursue even a single important item of evidence may demonstrate ineffectiveness and prejudice sufficient to warrant a new trial." *State v. Wells, 804 S.W.2d 746, 748 (Mo. banc 1991)*. This is, of course, if the withheld information is of a kind that could have affected the result of the trial. *Hayes v. State, 711 S.W.2d 876, 879 (Mo. banc 1986)*.[11] A person's eligibility for the death penalty in a capital murder case is just that.

Certainly, this Court cannot say with certainty how a jury would respond to the evidence of his intellectual disability. But neither could Mr. Johnson's counsel. Preserved for the defendant is the ability to decide whether to maintain his innocence of the death penalty, even with all the attendant risks, even though counsel may certainly discuss it with

---

[11] This same inquiry and approach has been used by a wide variety of federal and state supreme courts. *See Dando v. Yukins, 461 F.3d 791, 798-802 (6th Cir. 2006)* (holding it was deficient for counsel to advise petitioner to plead no-contest without first investigating through an expert the possibility of a duress defense based on battered woman's syndrome and to misinform the petitioner that retaining an expert would be done with her personal funds rather than with state funds); *Clay v. Dir., Juvenile Div., Dep't of Corr., 631 F.2d 516, 519-520 (7th Cir. 1980)* (holding a guilty plea to be involuntary and remanding for hearing on counsel ineffectiveness when defense counsel failed to inform a juvenile, who was home alone fending off a gang with a knife, that a defense of dwelling or self-defense argument could be made before she pleaded to assault with a deadly weapon); *Mendenhall v. Hopper, 453 F. Supp. 977, 987 (D. Ga. 1978)* (holding defendant's plea counsel was ineffective when he failed to adequately inform and advise his client as to the advisability of utilizing an insanity defense when mental evaluation revealed probable issues with defendant and such defense was the only available defense); *Commonwealth v. Santiago, 414 A.2d 1016, 1017-1018 (Pa. 1980)* (holding guilty plea was improperly induced when defendant's alleged intoxication could have negated the specific intent element of the robbery offense, and defense counsel erroneously advised the defendant that no defense based on intoxication was available).

37

his or her client explaining why, in counsel's view, conceding guilt would still be the best option. *McCoy v. Louisiana, 138 S. Ct. 1500, 1508 (2018).* Mr. Johnson asks this Court to vacate his guilty plea knowing full well that, on remand, he will have the burden to prove his intellectual disability. He deserves the opportunity to act on that choice.

## VI. CONCLUSION

What is at stake is whether a man who is intellectually disabled must serve life in prison without parole because his counsel failed to understand the meaning or consequence of intellectual disability under the law governing imposition of the death penalty. I would find Mr. Johnson has shown his defense counsel's performance was far outside the degree of skill, care, and diligence of a reasonably competent attorney given counsel's complete failure to inform Mr. Johnson of a possible defense to the death penalty.

Counsel's deficient performance stemmed from his incompetence in failing to familiarize himself with relevant law surrounding the eligibility for the death penalty and his inability to recognize the difference between competency and intellectual disability. I would further find there is a reasonable probability that, but for these errors, Mr. Johnson would not have pleaded guilty to a sentence of life without parole to avoid a death sentence and instead would have insisted on going to trial. *See Hill, 474 U.S. at 59.*

Given these facts, this Court should sustain Mr. Johnson's Rule 24.035 motion based on ineffective assistance of counsel, vacate his underlying sentence, and grant him a new trial in the underlying criminal cause of action. Alternatively, the Court should remand for a new evidentiary hearing at which a proper standard of review is applied pursuant to *Atkins*, *Moore I*, and *Moore II.*

38

For these reasons, I dissent.

_____
**LAURA DENVIR STITH, JUDGE**